### In re FLOWER CITY NURSING HOME, INC., Debtor.

### Louis A. RYEN, As Trustee in Bankruptcy of Flower City Nursing Home, Inc., Plaintiff,

v.

### PARK HOPE NURSING HOME, INC., Defendant,

v.

### FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF ROCHESTER, Interpleader Defendant.

### Bankruptcy Nos. 78–1655, 83–108A.

United States Bankruptcy Court, W.D. New York.

April 13, 1984.

---

David D. MacKnight, Rochester, N.Y., for trustee.

Beth Ela Wilkens, Rochester, N.Y., for defendant.

Dirk S. Adams, Rochester, N.Y., for interpleader defendant.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

The trustee of Flower City Nursing Home, the bankrupt in this case, which was converted from a Chapter XI to Chapter IV under the 1898 Bankruptcy Act, brought this action against the bankrupt's receiver, Park Hope Nursing Home, Inc., to compel turnover of medicaid capital cost reimbursement funds. All parties agree the funds on hand are reimbursement for capital rather than operating costs. Park Hope admitted it had no right to the funds, but it interpleaded First Federal Savings and Loan Association of Rochester, the first mortgagee, of the bankrupt's facility at 1556 Mt. Hope Avenue, Rochester, New York. The parties have stipulated the facts.

The First Federal mortgage and a modification and extension agreement dated February 1, 1973 covered a consolidated principal sum of $1,312,500. They contained clauses providing that in any foreclosure action, a receiver of rents and profits could be appointed *without notice and without regard to the adequacy of the security*. In the event of a default in payment of principal, interest or premiums, the agreement provided that such rents and profits were assigned to the mortgagee as further se-

curity for the debt and would be applied as if they were monthly installments.

On July 3, 1978, a foreclosure action was commenced by First Federal and on July 5, 1978, Milton Berger was appointed receiver of rents and profits. On July 6, 1978, Flower City filed a petition under Chapter XI of the Act; and on July 7, 1978, the Bankruptcy Court enjoined and restrained the continuation of the foreclosure action and restrained the receiver from taking possession. On August 25, 1978, First Federal commenced an adversary proceeding requesting the Court to lift the stay to permit a foreclosure action.

The debtor-in-possession and First Federal reached a compromise of the stay litigation on August 1, 1979 and this settlement was approved by the Court on August 30, 1979. The compromise provided for payments of principal and interest and for tax and insurance escrows. It also provided for the payment of arrears, including taxes, which had been paid by the mortgagee. These payments were over a ten year period. It permitted the foreclosure action to proceed only as far as an Order of Reference. All cash proceeds in excess of operating expenses and maintenance costs were to be paid to First Federal after payments under the plan were made.

The settlement provided that John Bartholemew be appointed manager of the nursing home and that any change in management without First Federal's approval would constitute a default. First Federal agreed that it would not further seek to foreclose its mortgage beyond reference nor seek to obtain possession of the premises as long as the scheduled payments were made.

The DIP failed to make current payments since October 1, 1981 and payments on arrears since November 1, 1981. First Federal sought an order to complete its State Court foreclosure action. The debtor was unable to formulate a successful plan and on December 15, 1982, it was adjudicated a bankrupt. Louis Ryen was appointed Chapter IV trustee.

New York Public Health Law § 2810 authorized the appointment of a receiver to operate a nursing facility. The trustee entered into an agreement with the New York State Department of Health and Park Hope Nursing Home, Inc., appointing the latter as receiver. The agreement provided that it conferred no rights on persons not a party to it (Clause 7.02). Park Hope has been acting as a receiver since December 13, 1982 and has received medicaid funds. The medicaid rate included a capital cost reimbursement component consisting of payment factors including interest on and amortization of capital indebtedness and return of equity (10 N.Y.C.R.R. § 86–2.21). The stipulated facts state that no medicaid capital cost reimbursement for return of equity was made with respect to Flower City's interest. First Federal has received no flow through medicaid capital cost reimbursement since June, 1982. Park Hope has in its possession $65,478 constituting medicaid capital cost reimbursement funds received by it from governmental authorities. In addition, payments have been made to Park Hope by private residents from their own funds.

Both the trustee and First Federal claim entitlement to these funds and Park Hope claims it is merely a stakeholder. First Federal and the trustee are unable to agree to the value of the collateral securing First Federal's mortgage interest.

The $65,478, medicaid capital cost reimbursement funds, are rents and profits within the meaning of the mortgage and modification agreements. These funds were reimbursement for the use and occupation of the realty and not for the daily operation of the nursing home business. Generally, rents and profits are income generated from the occupation or use of the realty and not income generated from general business operations (*Holmes v. Gravenhorst*, 263 N.Y. 148, 188 N.E. 285). Profits are synonomous with rents and not used in the sense of excess of income over expense in business operations (*Grusmark v. Echelman*, 162 F.Supp. 49 (D.C.N.Y.)). It has been held that where a business generates its income by leasing space, the

income generated has been construed as rents and profits (*Fairchild v. Gray,* 136 Misc. 704, 242 N.Y.S. 192).

The funds in question were generated by Flower City's rental of bed and living space to patients. Under N.Y.C.R.R. § 86–2.21, medicaid payments covered capital reimbursement costs defined as interest on capital, amortization of capital and return of equity. These are the costs attributable to real property. In the stipulation of facts, the parties agreed that these payments were for the return of equity. There is no question of fact that the capital cost reimbursement funds held by Park Hope fit within the term rents and profits in the mortgage and extension agreement.

 The Law of the situs of the real property determines the mortgagee's entitlement to rent proceeds during the course of the mortgagor's bankruptcy (*Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136). In New York, the assignment of rents clause in a mortgage is not self executing upon default. It operates as a pledge of rents to which the pledgee becomes entitled only after the pledgee asserts his right by taking affirmative steps such as requesting the Court to give him possession of the premises, or requesting the Court for an appointment of a receiver for the benefit of the mortgagee or obtaining an Order from the Court for the sequestration of the rents (*In re Pine Lake Village Apartment Co.,* 17 B.R. 829 (Bkrtcy.N.Y.)); (*In re Brose,* 254 F. 664 (6th Cir.)) and (*Sullivan v. Rosson,* 223 N.Y. 217, 119 N.E. 405). A mortgagee with a rent assignment has an equitable right to collect, but does not have legal title to rents automatically upon default. Rent is an incident of title which in New York remains in the mortgagor after default and which cannot be conveyed by a rent assignment clause in a mortgage prior to foreclosure (*Vecchiarelli v. Garsal Realty, Inc.,* 111 Misc.2d 157, 443 N.Y.S.2d 622).

 It has been held that where a bankruptcy petition is filed staying such affirmative action by a mortgagee to perfect its interest in rent proceeds, a mortgagee's petition to lift the stay to obtain appointment of a foreclosure receiver will perfect the interest (*In re Hines,* 88 F.2d 423, 425 (2nd Cir.)); and (*In re Kent,* 5 B.C.D. 47, 49). Under State Law, the request for the appointment of a receiver is enough to vest the right to rents and profits and it is not the actual appointment by the Court that vests rents and profits. The U.S. Supreme Court stated the general rule which was followed by the Second Circuit in *In re Brose,* supra, and in *Freedman's Savings Co. v. Shepherd,* 127 U.S. 494, 502–03. "The general rule is that the mortgagee is not entitled to the rents and profits of the mortgaged premises until he takes actual possession, or until possession is taken, in his behalf, by a receiver ... or until in proper form, he demands and is refused possession".

In the instant case, First Federal secured the appointment of a receiver during the course of its foreclosure proceedings on July 5, 1978. This vested their rights to rents and profits. The receiver was stayed from acting by this Court on July 7, 1978 after the bankruptcy. On August 25, 1978, First Federal commenced an adversary proceeding to lift the stay of its foreclosure action.

 Here the assignment of rents clause has vested. The fact that the mortgagee is not in possession of the premises does not affect his rights to rents and profits. First Federal's compromise of the stay litigation, by approval of the Bankruptcy Court, cannot be construed as a waiver of its vested rights to rents and profits. Under that agreement, First Federal was to be paid the monthly payments of principal and interest on its mortgage and arrearages. First Federal was entitled after a year to receive the net cash generated from the operation of Flower City above that which was necessary to pay expenses, payments to creditors under a plan and any amount in excess of costs of proper maintenance and improvements of the home. Stockholders of Flower City were to receive no cash proceeds until First Federal was fully paid. First Federal agreed to hold its foreclosure

action at the point of obtaining an Order of Reference until a default under the compromise agreement. In essence, First Federal gave up its right to possession and its priority of payment of net cash receipts in exchange for current payments and arrearages under the mortgage. The purpose of this agreement was to permit the proposal of a plan of arrangement.

Finally, the Court must look to whether it is equitable for First Federal to receive these funds. The parties state that they are unable to agree to the value of the collateral securing First Federal's mortgage. If First Federal is undersecured, they are entitled to the rents and profits from the security interest in the realty. If they are oversecured, the payment when applied to the mortgage debt enhances the bankrupt's equity in the realty and facilitates its sale for the benefit of the estate. The equities would appear to favor First Federal receiving this money as rents and profits and it is so ordered.